IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**GERARD LOUIS,**

  **Plaintiff,**

**v.**               **CIVIL ACTION NO. 1:06cv177**
                  **(Judge Keeley)**

**AL HAYNES, JOE DRIVER, D. GILL,
CAPT. MARUKA, LT. DUPREE AND
FOOD ADMINISTRATOR GREENAWARD,**

  **Defendants,**

## REPORT AND RECOMMENDATION

### I. Procedural History

The *pro se* plaintiff initiated this case on December 11, 2006, by filing a civil rights complaint against the above-named defendants pursuant to 42 U.S.C. § 1983. However, because the defendant's are federal employees, the undersigned construed the case as one filed pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §1983 and authorized suits against federal employees in their individual capacities. On December 13, 2006, the plaintiff was granted permission to proceed as a pauper. The plaintiff paid his initial partial filing fee on January 13, 2007.

On January 17, 2007, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Summonses were issued that same day.

On June 15, 2007, the defendants filed a Motion to Dismiss or for Summary Judgment. A <u>Roseboro</u> Notice was issued on June 18, 2007. On August 20, 2007, the plaintiff filed a Brief in

Opposition to the defendant's Motion to Dismiss or Motion for Summary Judgments.

Accordingly, this case is before the undersigned for a report and recommendation on the defendants' Motion to Dismiss or Motion for Summary Judgment.

## II. The Complaint

During the time period relevant to this complaint, the plaintiff was incarcerated at USP Hazelton which is located in Bruceton Mills, West Virginia.[1] In his complaint, the plaintiff alleges that the defendants have violated his 8th Amendment rights and denied him due process and equal protection. Specifically, he alleges that defendant Vicky Dupris ("Dupris") ordered him to stop eating at the beverage bar in the USP Hazelton dining hall and made him eat at a table which he alleged Dupris took from the Native Americans and assigned to "neutral" inmates. The plaintiff alleges that as a result of Dupris' actions, the Native Americans threatened him. The plaintiff alleges that he was subsequently sent to the Lieutenant's office due to death threats against him, but unspecified staff neglected to place him in protective custody in the Special Housing Unit ("S.H.U."). The plaintiff further alleges that one week later he was placed in the S.H.U. for a period of seventy-five days. Upon his release from the S.H.U., the plaintiff alleges that he was again forced to eat standing at the beverage bar. The plaintiff also alleges that he has been subjected to embarrassment and humiliation, and because the administration refuses to assign a "neutral table", he has resorted to "turning tricks" to feed himself. As relief, the plaintiff seeks $500,000.00 in damages plus punitive damages in the amount of $75,000.00 from each defendant.

---

[1] On June 12, 2007, the plaintiff was transferred from USP Hazelton, and after a holdover at the Federal Transfer center in Oklahoma City, Oklahoma, is currently incarcerated at USP Big Sandy which is located in Inez, Kentucky.

## III. Defendants', Warden Al Haynes, Warden Joe Driver, ASSO Warden D. Gill, Capt/SIA Maruka, SIS-LT Dupree, Food Administrator Greenaward, Motion to Dismiss, or Alternatively, Motion for Summary Judgment

In support of their Motions, these defendants allege that:

1. The plaintiff's claims regarding the alleged failure to place him in protective custody and subsequent involuntary placement in protective custody should be dismissed for failure to exhaust administrative remedies;

2. Their alleged failure to place the place in protective custody does not constitute a constitutional violation;

3. The plaintiff's alleged involuntary placement in protective custody does not constitute a constitutional violation;

4. The plaintiff's claims related to dining hall seating fail to allege a constitutional violation; and

5. They are entitled to qualified immunity.

## IV. Standard of Review

### A. Motion to Dismiss

In ruling on a motion to dismiss the Court must accept as true all well-pleaded factual allegations. Walker v. True, 399 F.3d 315 (4th Cir. 2005). Furthermore, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear, as a matter of law, that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S.

41, 4506 (1957).

## B. <u>Summary Judgment</u>

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. liberty lobby, Inc.</u>, 477 U.S. 242, 248 *1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u> at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. V. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id</u>. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return

a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita at 587 (citation omitted).

## V. ANALYSIS

### A. Exhaustion of Administrative Remedies

A Bivens action like an action under 42 U.S.C. §1983, is subject to exhaustion of administrative remedies as required by the Prison Litigation Reform Act (PLRA). Porter v. Nussle, 534 U.S. 516, 524 (2002). Under the PLRA, a prisoner bringing an action "with respect to prison conditions" under 42 U.S.C. §1983 must first exhaust all available administrative remedies. 42 U.S.C. §1997e. Exhaustion as provided in §1997e(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). While the phrase "with respect to prison conditions" is not defined in 42 U.S.C. §1997e, the Supreme Court has determined that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516 (2002).[2] Moreover, exhaustion is even required when the relief the prisoner seeks, such as monetary damages, is not available. Booth, 532 U.S. at 741.

---

[2]In Porter, an inmate sued the correctional officers who had severely beaten him. The inmate alleged that the correctional officers "placed him against a wall and struck him with their hands, kneed him in the back, [and] pulled his hair." Porter, 534 U.S. at 520.

The United States Supreme Court has held that proper exhaustion of administrative remedies is necessary, thus precluding inmates from filing untimely or otherwise procedurally defective administrative grievances or appeals and then pursuing a lawsuit alleging the same conduct raised in the grievance. See Woodford v. Ngo, 126 S.Ct. 2378 (2006). In Woodford, the United States Supreme Court clarified that the PLRA exhaustion requirement requires proper exhaustion. Id. at 2382. The Court noted that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 2386. The Court found that requiring proper exhaustion fits with the scheme of the PLRA, which serves three main goals: (1) eliminating unwarranted federal court interference with the administration of prisons; (2) "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." Id. at 2388. As the Court concluded, "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." Id.

The actions of the defendants regarding protective custody constitute actions "with respect to prison conditions" within the meaning of the PLRA, and the requirement of exhaustion of administrative remedies applies to those actions and the alleged effects of those actions.

The BOP provides a four-step administrative process beginning with attempted informal resolution with prison staff (BP-8). If the prisoner achieves no satisfaction informally, he must file a written complaint with the warden (BP-9),within 20 calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the Warden's response, he may

6

appeal to the regional director of the Federal Bureau of Prisons (BP-10) within 20 calendar days of the Warden's response. Finally, if the prisoner has received no satisfaction, he may appeal to the office of the General Counsel (BP-11) within 30 calendar days of the date the Regional Director signed the response. An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels. 28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

Attached to the defendant's Motion to Dismiss or for Summary Judgment are a number of Exhibits and Attachments. Exhibit I, which is the Affidavit of Alecia D. Sankey, establishes that as of June 14, 2007, the plaintiff had initiated various administrative remedies. Of those, several were filed during his designation to USP Hazelton and pertain to seating in the dining hall,[3] his placement in the SHU, and his protective custody status. (Docs. 37-3, p. 2 & 37-4, pp. 24-41).

On August 24, 2006, plaintiff filed Remedy ID 424946-F1 at USP Hazelton, requesting a hearing regarding his continued protective custody placement in the SHU. This remedy was rejected because he did not provide the necessary evidence of his attempt at informal resolution prior to his formal submission to the Warden's office. In order to complete informal resolution and follow the proper prodical, the plaintiff was allotted five days from August 26, 2006, to complete informal resolution. The plaintiff did not resubmit this administrative grievance. (Docs. 37-3, pp. 3-4 & 37-4, p. 38).

On September 11, 2006, the plaintiff filed Remedy ID 426652-F1 at USP Hazelton, inquiring

---

[3]The defendants do not dispute that the plaintiff has exhausted his administrative remedies regarding seating in the dining hall for homosexual inmates. Therefore, the undersigned has not outlined the course of his administrative remedies regarding that allegation.

about why he was still in the SHU, even though allegedly his protective custody investigation was closed one week prior. This remedy was also rejected because he failed to provide the necessary evidence of his attempt at informal resolution prior to filing his formal submission to the Warden's office. Like his first remedy regarding continued placement in protective custody, the plaintiff was allotted five days from September 11, 2006, to complete informal resolution. In addition, the remedy was rejected because it was improperly marked as sensitive. The plaintiff did not resubmit this administrative grievance. (Docs. 37-3, p. 4 & 37-4, p. 39).

On September 12, 2006, the plaintiff filed Remedy ID 427039-R1 to the Mid-Atlantic Regional Office regarding his protective custody status and a complaint against staff. In it, he requested that he be released to the compound at USP Hazelton. This remedy was rejected because the plaintiff improperly marked it as sensitive. In the rejection, the plaintiff was instructed to file his appeal at the institution. The plaintiff did not resubmit this administrative grievance. (Docs. 37-4, p. 39).

The plaintiff clearly failed to properly exhaust his administrative remedies with regard to the defendants' alleged failure to place in protective custody and his counter allegation that they then placed him in involuntary protective custody. To the extent that he initiated administrative remedies on the issue of protective custody, he failed to fully complete each level of the process on these claims, thereby failing to properly exhaust his administrative remedies. Plaintiff's failure to do so bars these claims and dismissal is appropriate. See Woodford v. Ngo, 126 S.ct. 2378, 2387 (2006); Booth v. Churner, 532 U.S. 731, 741 (2001)(Where inmate exhausted his grievance at the first level but failed to complete all three levels of the Pennsylvania grievance process, dismissal for failure to

exhaust was appropriate). However, regardless of whether the plaintiff's claims are exhausted or not, it is clear that the plaintiff has failed to state any claim against any of the defendants regarding the SHU and his protective custody status upon which relief can be granted.

**B. Failure to Place the Plaintiff in Protective Custody**

Like all prisoners, the plaintiff has no constitutional right to be held in protective custody. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994)(citing Hewitt v. Helms, 459 U.S. 460, 468 (1983); O'Bar v. Pinion, 953 F.2d 74, 83 (4th Cir. 1991))("[A]dministrative segregation and reclassification...are ...discretionary administrative acts in which an inmate obtains no liberty interest"). However, the Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. n3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of

9

and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837.

The essence of the plaintiff's claim is that officials at USP Hazelton should have known that by forcing him to sit at a table "reserved by the Native Americans" they were placing him in danger and then failed to protect him by not putting him in protective custody. However, he makes no credible allegation that any particular defendant knew or had reason to know that he was in any danger as the result of being told to sit at the table "reserved" by the Native Americans. In fact, the plaintiff merely makes the statement and provides no additional information. Furthermore, he makes no allegation whatsoever that he was actually harmed. More importantly, the plaintiff's claim that prison officials failed to protect him by placing him in protective custody is undermined by the record before the court. Of particular relevance is the fact that on July 2, 2006, two days after he was told to sit at the designated table, Lt. Montgomery observed the plaintiff sitting at the table with a Native American and it appeared they were having a heated discussion. When Lt. Montgomery questioned the plaintiff about his observation, the plaintiff stated that "the Native Americans did not want him sitting at the table due to his sexual preference." (Doc. 37-6, p. 3). Thereafter, a Native American inmate reported to staff that the plaintiff was not safe on the yard because he had "had called the Native Americans out during mainline, and the word came down to 'hit' him at first sight." Id. Accordingly, the plaintiff was placed in the Special Housing Unit that same date, pending completion of a Protective Custody Investigation. (Doc. 37-6, p. 1). It is noteworthy that the plaintiff did not want to be placed under protective custody and refused to sign the detention order requesting admittance prior to being placed in the Special Housing Unit. Id.

Therefore, the evidence before the court clearly establishes that officials at FCI Hazelton acted immediately upon becoming aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to the plaintiff. Accordingly, there was no violation of the plaintiff's Eighth Amendment rights, and this allegation should be dismissed.

C. **Plaintiff's Involuntary Placement in Protective Custody**

A liberal reading of the plaintiff's complaint would indicate that he is alleging that his involuntary confinement in protective custody violated his Eight Amendment right to be free of cruel and unusual punishment as well as his right to due process. However, the record establishes otherwise.

First, it is important to acknowledge again that prison officials have a mandatory duty "to take reasonable measures to guarantee the safety of the inmates." Hudson, supra. The Fourth Circuit has specifically ruled that placing an inmate in protective segregation does not violate the Eighth Amendment so long as there is a rational relationship between the restrictions and the desired objective of ensuring the inmate's safety. Taylor v. Rogers, 781 F.2d 1047, 1050 (4th Cir. 1986). Given the fact that prison officials were advised that a "hit" had been ordered on the plaintiff by the Native Americans, placement in protective custody was rationally related to the ultimate objective of keeping the plaintiff safe from other inmates.

Because the plaintiff's claims are directed at federal employees, the Fifth Amendment applies in determining his due process claim. See Berry v. City of Muskogee. 900 F.2d 1489, 1492 n. 2 (10th Cir. 1990) (Fifth Amendment protects against deprivations of life, liberty, or property by federal government). Due process questions are examined in two steps. First, it must be determined whether the government has interfered with a liberty or property interest. Second, if the government has interfered with such an interest, it must be determined whether the procedures which led to the

deprivation were constitutionally sufficient. Kentucky Dept't of Corrections v. Thompson, 490 U.S. 454, 459 (1989) (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972)) (applying 14th Amendment); Hewitt v. Helms, 459 U.S. 460 (1983). In making this inquiry, case law under 42 U.S.C. § 1983 is applicable to Bivens actions. See Butz v. Economou, 438 U.S. 478, 504.

The United States Supreme Court has held that prison inmates do not have a liberty interest in a certain prison classification arising from the Due Process Clause itself. Hewitt supra at 468. "[T]ransfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Id. at 467. Therefore, under the Due Process Clause itself, the plaintiff did not have a right to any hearing or other procedural safeguards before he was moved to protective custody or administrative detention in the SHU.

Furthermore, to the extent that the plaintiff may be alleging that officials at FCI Gilmer violated policy statements and operating procedures in holding him in protective custody, he again fails to state a due process claim. A Bivens action "must be founded upon a violation of constitutional rights," Arcoren v. Peters, 829 F.2d 671, 676 (8th Cir. 1987), and "a failure to adhere to administrative regulations does not equate to a constitutional violation." Hovater v. Robinson, 1 F.3d 1963, 1068 n. 4 (10th Cir. 1993).

Finally, in Sandin v. Conner, the Supreme Court held that regulatory language does not create a liberty interest unless the language regulates the imposition of "atypical and significant hardship...in relation to the ordinary incidents of prison life." 515 U.S. 472, 485-86 (1995). Although, without question, the conditions in the SHU are more restrictive and austere that those the plaintiff enjoyed in the general population, these conditions are within "the range of confinement to be normally expected for one serving" a federal prison sentence. Id. at 487. The plaintiff has cited nothing which

12

demonstrates a significant hardship. Therefore, the plaintiff's placement in administrative segregation did not affect a constitutionally protected liberty interest, and he had no right to any level of due process before he was placed there or while he was maintained there.

Additionally, the conditions in protective custody did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. To show an Eighth Amendment violation, the plaintiff must demonstrate (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials. See Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993), cert. denied 510 U.S. 949 (1993). Additionally there must be evidence of a "serious medical and emotional deterioration attributable to the challenged condition." Id. at 1380 (*quoting* Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990)).

The plaintiff does not complain that he was denied adequate, food, shelter, and medical care, nor that he was unprotected from harm. In fact, the plaintiff makes no complaints whatsoever about the conditions of his confinement in protective custody. Accordingly, the plaintiff's has made no showing that his confinement in the SHU under protective custody violated his right to be free from cruel and unusual punishment.

Finally, the Fourth Circuit has held that a prisoner's equal protection rights are not violated by involuntary placement in protective custody reasoning that "the difference in treatment among prisoners in protective segregation and the general population has a substantial, rational basis in the legitimate interest of prison security." Allgood v. Morris, 724 F.2d 1098, 1101 (4th Cir. 1984). In reaching this decision, the court reasoned that "[p]rotective segregation is offered to inmates for their safety, the safety of others in confinement, and to insure institutional security and order. To allow prisoners in protective segregation to enjoy all of the same privileges to the same degree as those in the general

population would eviscerate the value of protective segregation." Id. at 1100-1101.

Therefore, the plaintiff's Eighth Amendment rights, due process rights, and equal protection rights were not violated by his involuntary placement in protective custody. Accordingly, this allegation also fails to state a claim upon which relief can be granted.

### D. <u>Plaintiff's Claims Related to Dining Hall Seating</u>

Although not clearly articulated, it appears that the plaintiff is alleging that the BOP has failed to provide for assigned seating for homosexual inmates at USP Hazelton. Consequently, he alleges that "unmarried" homosexuals, like himself, cannot sit in the dining hall. As previously noted, the plaintiff alleges that he was forced to eat at the beverage bar because all of the tables in the dining hall were "reserved" by various groups. When he was told to sit at a table "reserved" by the Native Americans, tensions escalated to the point that he had to be placed in protective custody for a period of seventy-five days. When he was released from protective custody, the plaintiff maintains that the situation in the dining hall was so untenable that he was forced to turn tricks to feed himself.[4]

The defendants have responded to the plaintiff's allegations regarding the dining hall with an analysis focused on their defense that the plaintiff's claims with respect to the dining hall do not allege a constitutional violation. First, they argue that the dining hall seating does not present an Eighth Amendment Violation because the plaintiff has not been denied nutritionally adequate food, nor has he been served food that presents an immediate danger to his health and well being as the result of the way it is prepared and served. Second, they argue that his allegations do not allege a deprivation of a constitutionally protected liberty interest protected by due process because he has no right to a seat in

---

[4] It is not clear from the plaintiff's pleadings whether is alleging that he was trading sex for food or for money so that he could buy food in the commissary.

the dining hall. Third, they argue that the plaintiff's allegations regarding the dining hall do not constitute an equal protection violation because he does not allege that he was treated differently from others with whom he is similarly situated. Finally, they argue that even if a constitutional violation occurred, the plaintiff's claim must fail because the dining hall seating arrangements pass the Turner test.

The regulation at issue is the policy of the BOP not to assign seating to any particular group of inmates. (Doc. 37-5, p. 8). In evaluating the reasonableness of a prison regulation, the court must apply the four factors set forth in Turner v. Safley, 482 U.S. 78, 89-90 (1987). "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Turner at 89. Second, the court must determine whether there are alternative means of exercising the right that remain open to prison inmates. Where 'other means' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials...in gauging the validity of the regulation." Id. (internal citations omitted.) Third, the court must consider the "impact accommodation of the asserted constitutional right will have on guard and other inmates, and on the allocation of prison resources generally. Turner, supra at 89. Finally, the court must consider that the absence of ready alternatives is evidence of the reasonableness of the regulation. Conversely, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable. Id..

Clearly the plaintiff has a constitutional right to eat while incarcerated. If the plaintiff's sole complaint was that he is forced to eat while standing up, then the regulation against assigning seating

would clearly pass muster.[5]  Additionally, if the plaintiff could simply choose not to eat in the dining hall, and instead, purchase and eat food from the commissary, the regulation would again pass muster. However, the plaintiff is alleging that he must turn tricks to obtain food which implies that he does not have the financial resources to buy his food on a continuous basis from the commissary.[6]  If, in fact, the plaintiff was forced to turn tricks in order to feed himself, the regulation in question may fail the Turner test, and or, the defendants may have failed to adequately protect the plaintiff.  The problem is that defendants have no affidavits or declarations, as they often do, to demonstrate factually how the Turner factors are met or to refute plaintiff's allegations. Therefore, the undersigned is of the opinion that further investigation of this issue is required.

## VI.  RECOMMENDATION

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motion to Dismiss or for Summary Judgment be **GRANTED** with respect to the plaintiff's claims regarding protective custody and be **DENIED** with respect the plaintiff's claim that he was forced to prostitute himself in order to obtain food as the result of the dining hall seating..  In addition, the undersigned recommends that the Court issue a scheduling Order to address that issue.

Any party may file within ten (10) days after being served with a copy of this Recommendation with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are  made, and the basis for such objections.  A copy of such objections should also be

---

[5] The undersigned notes that it is not clear whether the plaintiff was prevented from eating at the beverage bar after he was released from protective custody.

[6] The plaintiff's prisoner trust account had a balance of $0.13 on November 1, 2006, one moth before he hiled the complaint in this matter.  During the seven months preceding that date, the plaintiff trust account balance never exceeded the $54.94 he had when he transferred into USP Hazelton.

16

submitted to the Honorable Irene M. Keeley, United States District Court. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet. The Clerk is further directed to provide a copy of this Report and Recommendation to any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: February 5, 2008

                                                        /s/ James E. Seibert
                                                  JAMES E. SEIBERT
                                                  UNITED STATES MAGISTRATE JUDGE